# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                     Nos. CR 16-3069 JB
                                             CR 16-3308 JB

GASPAR LEAL,

     Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant's Sealed Sentencing Memorandum,[1] filed February 4, 2020 (Doc. 222)("Sentencing Memorandum"); and (ii) the United States' Sentencing Memorandum, filed February 5, 2020 (Doc. 223)("U.S. Sentencing Memorandum"). The Court held a sentencing hearing on February 13, 2020. See Clerk's Minutes at 1, filed February 13, 2020 (Doc. 151) The issue is whether the Court should sentence Defendant Gaspar Leal to 480-months of imprisonment, which is the sentence the Plaintiff United States of America requests and is within the Guideline sentencing range of 360 months to life, based on Leal's convictions for Conspiracy to Distribute 50 Grams and More of Methamphetamine, in violation of 21 U.S.C. § 846, 21 U.S.C. § 841(b)(1)(A), and Conspiracy to Distribute 50 Grams and More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in

---

[1]The Court notes that the Defendant filed his Sentencing Memorandum, which includes the Defendant's Confidential Forensic Neuropsychological Evaluation, filed February 4, 2020 (Doc. 222-1)("Paret Report"), under seal. See Sentencing Memorandum at 1-7. See also Paret Report at 1-50. Because the Court discussed the contents of the Defendant's Sentencing Memorandum and the Paret Report in open court during the sentencing hearing, however, the Court will not file its Memorandum and Opinion ("MOO") under seal, given the Court does not feel that it reveals any confidential information in the MOO that was not already discussed during the sentencing hearing. Nonetheless, if the parties have any objections as to the confidentiality of the information discussed in the MOO, the Court will seal this opinion and file a redacted version.

violation of 21 U.S.C. § 846, 21 U.S.C. § 841(b)(1)(B), or whether the Court should grant Leal's requested downward variance based on his diminished capacity at the time of his offenses. Having weighed carefully the factors in 18 U.S.C. § 3553(a), the Court determines that a 360-month imprisonment term sentence is appropriate, because any lesser sentence would not be sufficient to reflect the factors in 18 U.S.C. § 3553(a), and a 360-month imprisonment term sentence complies with 18 U.S.C. § 3553(a)(2)'s purposes.

.**FACTUAL BACKGROUND**

The Court takes its facts from the Presentence Investigation Report  filed October 1, 2019 (Doc. 213)("PSR"), because the parties make no objections to the facts. The Court provides these facts for background. It does not adopt them as the truth, and it recognizes that these facts are largely Plaintiff United States of America's version of events.

1. **Leal's First Offense Conduct: Case CR 16-3069 JB.**

Leal's first offense conduct, for which the Court currently sentences him, occurred in approximately April, 2016. See PSR ¶ 9, at 6. In April, 2016, an Alcohol, Tobacco, Firearms, and Explosives ("ATF") agent received a business card bearing a company name "Mobile Leal Clean Cuts," as well as an individual's name "Gaspar Leal Jr., Fade Specialist," and a telephone number. PSR ¶ 9, at 6. Upon conducting research on Leal, the ATF agent discovered that Leal had a criminal record. See PSR ¶ 9, at 6. The ATF agent also learned that, at the time, Leal currently was on parole for convictions in the Second Judicial District Court in Albuquerque, New Mexico for (i) Trafficking (By Possession with Intent to Distribute Heroin), Docket No. D-202-CR 2012-01021 and a crime of violence, and Kidnapping, Docket No. D-202-CR-2012-03059. See PSR ¶ 9, at 6. The ATF agent passed this information, along with Leal's business card, to a Confidential Informant ("CI"). PSR ¶ 9, at 6. Shortly thereafter, the CI made contact with Leal, and engaged with him in multiple conversations. See PSR ¶ 10, at 6. During certain conversations, Leal

disclosed to the CI that: (i) he was from Chicago; (ii) he had previously served time in prison; (iii) while in prison, he worked as a barber; and (iv) and he was currently on parole.  See PSR ¶ 9, at 6.  During the conversations, the CI noted that there was an ankle monitoring bracelet on Leal's ankle.  See PSR ¶ 10, at 6.

On May 7, 2016, the CI met with Leal at Leal's residence for a prearranged haircut.  See PSR ¶ 11, at 6.  The CI reports that the haircut at Leal's residence took two hours, because of the heavy volume customers arriving at Leal's residence to purchase narcotics.  See PSR ¶ 11, at 6.  The CI also reports that, on May 7, 2016, Leal was in possession of "crack" cocaine, powder cocaine, heroin, and crystal methamphetamine.  PSR ¶ 11, at 6.

Three days later, on May 10, 2016, the CI met with a subject who introduced himself as "Pete."  PSR ¶ 12, at 6.  The CI met with Pete to purchase methamphetamine.  See PSR ¶ 11, at 6.  Beginning around this time, in addition to having conversations with Pete, the CI started purchasing methamphetamine from Leal.  See PSR ¶ 12, at 6.  Accordingly, on May 10, 2016, the CI called Leal requesting methamphetamine, to which Leal referred the CI to his source of supply ("SOS"), Pete, for the purchase.  PSR ¶ 12, at 6.  After the CI agreed to pick up Pete, Pete indicated that the methamphetamine would be priced at $600.00 per ounce.  See PSR ¶ 12, at 6.

Once the CI picked up Pete, the CI expressed interest to Pete in purchasing two ounces of methamphetamine.  See PSR ¶ 13, at 6.  Pete responded to the CI's request by stating that his SOS could supply the methamphetamine.  See PSR ¶ 13, at 6.  Pete also reported to the CI that, when he lived in Las Vegas, Nevada, he would distribute "half a pound of dope a night."  PSR ¶ 13, at 6.  Pete subsequently informed the CI that he could obtain firearms and referenced a different SOS for drugs and guns.  See PSR ¶ 13, at 6.  As it related to the immediate sale, Pete told the CI that he then could acquire marijuana for $2,100.00 per pound, at which point, the CI and Pete

negotiated the sale of 3.5 grams of methamphetamine for $100.00.  See PSR ¶ 13, at 6.  After Pete

weighed five small plastic baggies of methamphetamine on his scale, the CI paid him $100.00.

PSR ¶ 13, at 6.  Subsequent drug laboratory reports reflect that the 3.5 grams of methamphetamine

was 100.0% pure, with a net weight of 3.2 grams.  See PSR ¶ 13, at 6.  Pete and the CI then agreed

to meet later in the day so that the CI could purchase two additional ounces of methamphetamine,

which Pete stated he would get from his SOS.  See PSR ¶ 13, at 6.  Two hours later, however, Pete

called the CI, informing the CI that he could not make contact with his SOS.  See PSR ¶ 13, at 6.

At this point, the CI contacted Leal, who confirmed that the transaction occurred between the CI

and Pete.  See PSR ¶ 13, at 6.  Leal also told the CI that he had access to another SOS, from whom

he could obtain the methamphetamine for the CI's next purchase.  See PSR ¶ 13, at 6.

On May 12, 2016, the CI met Leal at his apartment to make the methamphetamine

purchase.  See PSR ¶ 14, at 6.  Leal's SOS, however, was not able to retrieve the CI's requested

two ounce quantity of methamphetamines.  See PSR ¶ 14, at 6.  Leal, therefore, sold heroin and

methamphetamine only to the CI on May 12, 2016, for $70.00.  See PSR ¶ 14, at 6.  Leal reported

to the CI that the methamphetamine weighed 0.5 grams, including packaging, while the heroin

weighed 1.2 grams, with packaging.  See PSR ¶ 14, at 6.  The subsequent drug laboratory report

reflects that the heroin and methamphetamine, without packaging, weighed 0.2565 grams, and the

methamphetamine was of 100% purity.  See PSR ¶ 14, at 6.

On June 6, 2016, Leal was taken into custody for unrelated conduct and detained in the

Bernalillo County Jail.  See PSR ¶ 15, at 7.  While in custody, Leal arranged for the CI and an

Undercover Agent ("UA") to purchase methamphetamine from "Auroa," a woman later identified

to be Bernadette Tapia ("B. Tapia").  See PSR ¶ 15, at 7.  While in Bernalillo County custody,

Leal also advised the CI and the UA that he could arrange for them a firearm purchase.  See

PSR ¶ 15, at 7.

Under Leal's direction from Bernalillo County Jail, on June 8, 2016, the CI and B. Tapia met at a predetermined location. See PSR ¶ 16, at 7. B. Tapia arrived at the location in a vehicle that her daughter, Candace Tapia ("C. Tapia") drove. PSR ¶ 16, at 7. As the group awaited the arrival of B. Tapia's SOS -- the individual who would be supplying the CI with the drugs -- B. Tapia told the CI that she knew Leal through her "man," who also knew Leal. PSR ¶ 16, at 7. At this point, the SOS contacted B. Tapia, advising her that he or she was stuck in traffic. See PSR ¶ 16, at 7. Immediately thereafter, C. Tapia and B. Tapia told the CI that they could obtain the two ounces of methamphetamine from a difference source. See PSR ¶ 16, at 7. After the CI agreed to the alternative arrangement, the group traveled to a parking lot at a different location. See PSR ¶ 16, at 7.

Next, C. Tapia and the UA traveled to C. Tapia's residence, where the two awaited C. Tapia's SOS. See PSR ¶ 17, at 7. During this time, the CI and B. Tapia remained in the second parking lot. See PSR ¶ 17, at 7. Eventually, C. Tapia's SOS arrived at C. Tapia's residence, identifying himself as Brandon Candelaria, C. Tapia's boyfriend. See PSR ¶ 17, at 7. Candelaria then provided C. Tapia the methamphetamine, and C. Tapia, in turn, sold the UA the two ounces of methamphetamine for $1,350.00. See PSR ¶ 17, at 7.

Once C. Tapia and the UA returned to the parking lot, C. Tapia told the UA to contact her in the future for additional purchases. See PSR ¶ 18, at 7. At this time, the UA paid $50.00 to C. Tapia, and paid $60.00 to B. Tapia for her assistance in brokering the transaction. See PSR ¶ 18, at 7. B. Tapia then told the UA that she, too, had multiple sources of methamphetamine supply. See PSR ¶ 18, at 7. At that particular moment, as B. Tapia explained, she had purchased eight balls of methamphetamine to sell, with each ball weighing 3.5 grams. See PSR ¶ 18, at 7. B.

Tapia also advised the UA that she could get methamphetamine all day and indicated that she had customers with many sales pending.  See PSR ¶ 18, at 7.  On June 9, 2016, ATF agents placed $60.00 in Leal's commissary for his assistance in brokering the deal.  See PSR ¶ 18, at 7.  A subsequent drug laboratory report reflects that C. Tapia had provided the UA a net weight of 55.75 grams of methamphetamine, with a 93.0% purity level.  See PSR ¶ 18, at 7.

On June 9, 2016, Leal contacted the CI again, advising the CI that he could arrange another drug transaction, because there was a guy who owed Leal.  See PSR ¶ 19, at 7.  To help initiate the deal, Leal contacted B. Tapia, requesting that she go downtown to meet his nephew, because he had many online customers who he did not want to lose by failing to get them the drugs on time.  See PSR ¶ 19, at 7.  On June 11, 2016, Leal asked the CI if he had contacted B. Tapia, to which the CI reported that he had already contacted her.  See PSR ¶ 19, at 7.  The CI then agreed to put money in Leal's commissary if the CI could conduct a drug transaction on Leal's behalf. See PSR ¶ 19, at 7.  Leal agreed, although he wished to split the profits of the transaction with the CI.  See PSR ¶ 19, at 7.

Five days later, on June 14, 2016, the CI and B. Tapia met again, where B. Tapia advised the CI that she could acquire five guns and sell them to him for $2,000.00.  See PSR ¶ 20, at 7. During this time, another Special Agent ("SA"), who was with the two, inquired of B. Tapia the methamphetamine price, to which B. Tapia replied that it was $600.00 an ounce.  PSR ¶ 20, at 7. During the conversation, B. Tapia also indicated that she would make $100.00 brokering the transaction.  See PSR ¶ 20, at 7.  B. Tapia then sold the CI approximately 30 grams of methamphetamine, which, according to laboratory results, was 97.0% pure.  See PSR ¶ 21, at 7. That same day, Leal contacted the CI, and the CI confirmed to Leal that the drug transaction had occurred between the CI and B. Tapia.  See PSR ¶ 21, at 7.  Leal then asked the CI to put money

in his commissary.  See PSR ¶ 21, at 7.

    In summary, Leal's first offense, for which the Court is currently sentencing him, involves Leal's sale of: (i) 3.2 grams of methamphetamine of 100.0% purity on May 10, 2016, to the CI; (ii) 0.2565 grams of methamphetamine of 100.0% purity on May 12, 2016, to the CI; (iii) 51.83 grams of methamphetamine of 100.0% purity on June 8, 2016, while in custody at Bernalillo County Jail; and (iv) 27.1 grams of methamphetamine, of 100.0% purity, while also in Bernalillo County custody.  See PSR ¶ 22, at 7.  Collectively, Leal's methamphetamine sales totaled 82.3865 grams of 100.0% purity.  See PSR ¶ 22, at 7.  In addition, while in Bernalillo County custody, Leal arranged for the CI and the UA to purchase methamphetamine from B. Tapia on June 8, 2016, and June 14, 2016.[2]  See PSR ¶ 22, at 7.  In addition to selling methamphetamine, during this period, Leal indicated to the CI and the UA that he could obtain firearms.  See PSR ¶ 22, at 7.

    **2.**    **Leal's Second Offense Conduct: Case CR 16-3308 JB.**

    Leal's second offense conduct, for which the Court is currently sentencing him, occurred in July, 2016.  See PSR ¶ 26, at 8.  In July, 2016, Leal was incarcerated at the Central New Mexico Correctional Facility ("Central NM") in Los Lunas, New Mexico.  See PSR ¶ 26, at 8.  While detained at Central NM, Leal placed a recorded phone call to the CI.  See PSR ¶ 26, at 8.  On the phone call, Leal told the CI to contact an individual named "Jose Casillas" ("Casillas"), and provided the CI with Jose's phone number.  PSR ¶ 26, at 8.  The CI subsequently placed a recorded phone call to Casillas.  See PSR ¶ 26, at 8.  During the phone call, the CI reports that Casillas understood the CI was interested in purchasing methamphetamine.  See PSR ¶ 26, at 8.  Casillas then indicated to the CI that he was going to contact a female individual via Facebook, and obtain

---

[2]The PSR indicates that, although Leal was involved in arranging drug transactions with B. Tapia, he does not appear to have had an aggravating role in those drug transactions; rather, B. Tapia "appears to have been selling methamphetamine for her own personal gain."  PSR ¶ 22, at 8.

prices for the methamphetamine, at which point, he would then contact the CI again.  See PSR ¶ 26, at 8.   At the end of the case, Casillas told Leal that he could introduce the CI to the female individual in person, so that he could cease in acting as the "middle-man" during the transaction. PSR ¶  26, at 8.

On July 22, 2016, the CI was contacted via text message from a phone number associated with an individual named "Errika Barrza."  See PSR ¶ 27, at 8.  Two days later, on July 24, 2016, at approximately 7:27 pm, the CI placed a recorded phone call to Barraza.  See PSR ¶ 27, at 8. During the conversation, the CI asked Barraza if she was the individual who had contacted him via text message.  See PSR ¶ 27, at 8.  Barraza replied affirmatively, indicating to the CI that she had been instructed by her boyfriend, "Arreola-Palma" -- who was then in prison with Leal -- to contact the CI.  PSR ¶  27, at 8.  On the same day,  the CI received an incoming phone call from Casillas, who, at the time, was in the midst of a three-way phone call with Leal.  See PSR ¶ 27, at 8.  During the three-way conversation, Leal stated that he had been having difficulty establishing contact with the CI, given he had been attempting to call the CI from the prison facility.  See PSR ¶ 27, at 8.  Shortly thereafter, Leal placed Arreola-Palma on the phone with the CI.  See PSR ¶ 27, at 8.  Arreola-Palma advised the CI to contact one of his cousins, and also instructed the CI to tell his cousins that Arreola-Palma had referred the CI to them.  See PSR ¶ 27, at 8.  Arreola-Palma next identified one of his cousins, "Daniel Carmona," by name.  PSR ¶ 28, at 9.  Arreola-Palma explained to the CI that, although Carmona, did not speak English, Carmona would still be able to provide the CI with one ounce of methamphetamine for $300.00 during an initial transaction, and $400.00 for any future transaction.  See PSR ¶ 28, at 9.  The CI indicated that these were good prices -- far better than he had been previously able to purchase methamphetamine for in the past.  See PSR ¶ 28, at 9.  The CI stated further that he would be able to financially

compensate Arreola-Palma for his role as a broker in the transaction; Arreola-Palma favorably acknowledged the CI's promise, and explained that he was assisting in the brokering of the drug transaction as a deal to Leal.  See PSR ¶ 28, at 9.  The CI then advised Arreola-Palma that he would contact Carmona and attempt to arrange a meeting for the following day.  See PSR ¶ 28, at 9.  At this point, Leal returned to the phone conversation, and provided the CI with a contact number for Carmona.  See PSR ¶ 28, at 9.  After Casillas failed in connecting a three-way phone call, Arreola-Palma instructed the CI to simply text him to establish contact – to which the CI agreed.  See PSR ¶ 28, at 9.  Leal then requested for the CI to send him money in prison under his inmate number "69999."  PSR ¶ 28, at 9.  Arreola-Palma provided the CI with Central NM's address, and Casillas recorded all of the information from the phone conversation.  See PSR ¶ 28, at 9.

Conversations between the CI, Arreola-Palma, and Casillas continued throughout the rest of July 24, 2016, with the CI engaging via telephone with Carmona at one point, to inquire if Carmona was able to provide him methamphetamine for purchase.  See PSR ¶ 29, at 9.  Carmona responded favorably, asking the CI when he wished to conduct a transaction.  See PSR ¶ 29, at 9.  Carmona agreed to the CI's requests that the methamphetamine transaction be conducted the following day, around midday.  See PSR ¶ 29, at 9.  Thereafter, the CI and Carmona, during a series of text messages, agreed to Carmona's quoted price of $550.00 per ounce of methamphetamine.  See PSR ¶ 30, at 9.  The two also agreed to meet to conduct the drug exchange in the parking lot of a Walmart in Albuquerque, New Mexico.  See PSR ¶ 30, at 9.  The next day, at approximately 5:50 pm, the CI, accompanied by another undercover agent, arrived in an undercover vehicle to meet Carmona at the Walmart parking lot.  See PSR ¶¶ 30-31, at 9.  While in the parking lot, the CI received a phone call from Carmona.  See PSR ¶ 32, at 9.  On the phone call, Carmona indicated that he had arrived in the lot, and stated that he planned to park his vehicle

behind the CI's undercover vehicle so that the CI could enter his vehicle to conduct the drug exchange.  See PSR ¶ 32, at 9.  At approximately 6:27 pm, the UA, who was accompanying the CI, observed Carmona's red Honda coupe pull into the parking space behind the undercover vehicle.  See PSR ¶ 33, at 10.  As soon as Carmona parked, the UA and the CI exited their undercover vehicle and entered Carmona's vehicle.  See PSR ¶ 33, at 10.  Once inside Carmona's vehicle, the UA paid Carmona in exchange for the 57.4 net grams of methamphetamine.  See PSR ¶ 33, at 10.

A second sale of methamphetamine occurred on August 3, 2016.  See PSR ¶ 34, at 10.  The August 3, 2016 exchange involved Carmona selling 55.9 net grams of methamphetamine to the UA and the CI.  See PSR ¶ 34, at 10.  Following the sale, the ATF immediately arrested Carmona, who, at the time, was armed with a handgun.  See PSR ¶ 34, at 10.

In summary, Leal's second offense, for which the Court is currently sentencing him, involved his assistance, as a Bernalillo County Jail inmate, with Luis Arreola-Palma and Daniel Carmona, fellow Bernalillo County Jail inmates, for the sale of methamphetamine to the CI on two occasions.  See PSR ¶ 35, at 10.  Accordingly, Arreola-Palma, Carmona, and Leal, are charged for their conduct related to the two methamphetamine transactions, one of which involved their sale of the 57.5 net grams of methamphetamine, on July 24, 2016, and the second of which involved their sale of the 55.9 net grams of methamphetamine on August 3, 2016.  See PSR ¶ 35, at 10.  During both sales, the PSR reports that Arreola-Palam played the role of an "organizer" of the drug exchange, Carmona worked under Arreola-Palma's direction, and Leal represented the "middle-man," who connected Arreola-Palma and the CI.  PSR ¶ 35, at 10.

## PROCEDURAL BACKGROUND

The Court will discuss the procedural background in eight sections.  In sections 1 and 2, the Court will describe Leal's Indictment in Case No. CR 16-3069 JB and Leal's Superseding

Indictment in Case No. 16-3308 JB, respectively.  In section 3, the Court will describe the PSR's Guidelines sentencing calculations related to Leal's two convictions.  In section 4, the Court will discuss Leal's Sentencing Memorandum.  In section 5, the Court will discuss the Confidential Forensic Neuropsychological Evaluation, filed February 4, 2020 (Doc. 222)("Paret Report"), which Leal filed along with his Sentencing Memorandum.  In section 6, the Court will discuss the U.S. Sentencing Memorandum.  In section 7, the Court will discuss the Addendum to the Presentence Report, filed February 10, 2020 (Doc. 224)("PSR Addendum").  In section 8, the Court will discuss the sentencing hearing.

## 1.    The Indictment in Case No. CR 16-3069 JB.

On July 12, 2016, an Indictment was filed related to Case No. CR 16-3069 JB, in the United States District Court for the United States District of New Mexico.  See Indictment at 1-3, filed July 12, 2016 (Doc. 2).  See also PSR ¶ 1, at 5.  The Indictment charged the Defendants, Gaspar Leal, B. Tapia, Brandon Candelaria, and C. Tapia, with: (i) Count I: "Conspiracy to Distribute 50 Grams and More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine," and (ii) Count II, "Distribution of 50 Grams and More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine."  PSR ¶ 1, at 5.  The Indictment referenced the offense that occurred on June 8, 2016 in Bernalillo County.  See PSR ¶ 1, at 5.  On February 13, 2017, Leal was referred to the Bureau of Prisons ("BOP") to evaluate his competency.  See PSR ¶ 2, at 5.  Leal's evaluation took place from February, 2017 to May, 2017.  See PSR ¶ 2, at 5.  At the end of the approximately four month evaluation, Leal was declared competent to stand trial.  See PSR ¶ 2, at 5.  Thereafter, on December 6, 2017, Leal was found guilty by jury trial of the Indictment's Count I – "Conspiracy to Distribute 50 Grams and More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine," in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(b)(1)(B).  PSR ¶ 3, at 5.  There is no plea agreement in Case No. CR 16-

3069 JB.  See PSR ¶ 3, at 5.

      **2.**      **The Superseding Indictment in Case No. CR 16-3308 JB.**

On December 20, 2017, a Superseding Indictment, related to Case No. CR 16-3308, was filed in the District of New Mexico.  See Superseding Indictment at 1-3, filed December 20, 2017, (Doc. 95).  See also PSR ¶ 4, at 5.  The Superseding Indictment charged Gaspar Leal with Count I: "Conspiracy to Distribute 50 Grams and More of Methamphetamine," in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841 (b)(1)(A); and Counts II and III: "Distribution of 50 Grams and More of Methamphetamine and Aiding and Abetting," in violation of 21 U.S.C. § § 841(a)(1) and (b)(1)(B).  PSR ¶ 4, at 5.  The Superseding Indictment referenced the offense that occurred from July 21, 2016, to August 3, 2016, in Bernalillo County, New Mexico.  See PSR ¶ 4, at 5.  On July 23, 2019, Leal was found guilty by jury trial to the Superseding Indictment's Count I: "Conspiracy to Distribute 50 Grams and More of Methamphetamine, "in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841 (b)(1)(A).  PSR ¶ 5, at 5.  There is also no plea agreement in Case No. CR 16-3308 JB.  See PSR ¶ 5, at 5.

      **3.**      **The PSR for Case No. CR 16-3369 JB and Case No. CR 16-3308 JB.**

The United States Probation Office ("USPO") issued the PSR on October 1, 2019.  See PSR at 1.  The PSR indicates that U.S.S.G. § 2D1.1 governs Count I, Leal's 21 U.S.C. § 846 violation -- "Conspiracy to Distribute 50 Grams and More of Methamphetamine" in Case No. CR. 16-3308.  PSR ¶ 40, at 10.  The PSR states that, under U.S.S.G § 2D1.1, Leal's base offense level is 30.  See PSR ¶ 40, at 10.  The PSR does not assess any enhancements for Leal's 21 U.S.C. § 846 violation.  See PSR ¶ 46, at 10.  The PSR subsequently states that U.S.S.G. § 2D1.1 also governs Count II, Leal's 21 U.S.C. § 846 violation --"Conspiracy to Distribute 50 Grams and More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine" in Case No. CR

16-3069.  PSR ¶ 46, at 30.  The PSR states that, under U.S.S.G. § 2D1.1, Leal's base offense level

for the 21 U.S.C. § 846 violation is 30.  See PSR ¶ 46, at 30.  For Count II, the PSR calculates a

2-level enhancement to Leal's base offense level of 30 under U.S.S.G. § 2D1.1(b)(12), based on

Leal "maintain[ing] a premises for the purpose of distributing methamphetamine."  PSR ¶ 47, at

30 (citing U.S.S.G. § 2D1.1(b)(12)).  The calculation results in Leal's total offense level of 32 for

his 21 U.S.C. § 846 violation in Case No. CR 16-3069.  See PSR ¶ 51, at 11.

      The PSR then addresses multiple count adjustments related to Leal's Count in Case No.

CR. 16-3308 and Count II in in Case No. CR 16-3069.  See PSR ¶ 52, at 11. When assessing the

"Multiple Count Adjustment" calculation, the PSR explains:

> **Multiple Count Adjustment**: Units are assigned pursuant to USSG §
> 3D1.4(a), (b) and (c).  One unit is assigned to the group with the highest offense
> level. One additional unit is assigned for each group that is equally serious or from
> 1 to 4 levels less serious. One-half unit is assigned to any group that is 5 to 8 levels
> less serious than the highest offense level. Any groups that are 9 or more levels less
> serious than the group with the highest offense level are disregarded.

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Count 1 | 30 | 1.0 |
| Count 2 | 32 | 1.0 |

| Total Number of Units | 2.0 |
|---|---|

PSR ¶ 51, at 11.

      Next, the PSR assesses independently Leal's offense level for Count II, because, as the

PSR notes, Count II was the "greater of the adjusted offense levels" from its calculation above.

PSR ¶ 53, at 11.  Here, the PSR indicates that Count II's offense level is "increased pursuant to the

number of units assigned by the amount indicated in the table at U.S.S.G. § 3D1.4," which is 2

units.  PSR ¶ 54, at 11.

| Number of Units | Increase in Offense Level |
|---|---|
| 1 | none |
| 1 1/2 | Add **1** Level |
| 2 | Add **2** Levels |
| 2 1/2 - 3 | Add **3** Levels |
| 3 1/2 - 5 | Add **4** Levels |
| More than 5 | Add **5** Levels |

U.S.S.G. § 3D1.4 (bold in original).

Based on the table's calculations then, the PSR calculates Leal's "Combined Adjusted Offense Level" at 34, which the PSR "determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at U.S.S.G. § 3D1.4." PSR ¶ 55, at 11. In addition, the PSR explains that, under the "Chapter 4 Enhancement," because Leal (i) "was at least 18 years old at the time of the instant offense of conviction;" (ii) "the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense"; and (iii) "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense," Leal is classified as a "career offender." PSR ¶ 56 at 11-12. As a career offender, Leal's offense level is 37, "because the statutory maximum term of imprisonment is life." PSR ¶ 57, at 11-12. The PSR also notes that it will not deduct any levels from Leal's offense level based on "Acceptance of Responsibility," because Leal "has not clearly demonstrated acceptance of responsibility for the offense." PSR ¶ 57, at 12 (citing U.S.S.G. § 3E1.1.)

Next, the PSR assesses that Leal's past convictions result in a subtotal criminal history score of 24. See PSR ¶ 87, at 21. The PSR adds 2 additional points to the 24 subtotal criminal

history score, to reach a total criminal history score of 26, because, Leal "committed the instant offense while under a criminal justice sentence for Docket No.: D-202-CR-2012-03059."  PSR ¶ 88, at 21 (citing U.S.S.G. § 4A1.1(d)).  Because Leal's total criminal history score is 26, he is "in a criminal history category of VI."  PSR ¶ 89, at 21.

The PSR then considers Leal's "Offender Characteristics," the information of which was largely obtained during Leal's presentence interview.  See PSR ¶ 121, at 27.   Of particular relevance, the PSR reports that Leal has a history of substance abuse, which began with Leal's experimentation with cocaine at age twenty-nine, and use of heroin beginning at age twenty-one. See PSR ¶ 34, at 30.  According to the PSR, Leal was "last using heroin on a daily basis until he was arrested for the instant offense."  PSR ¶ 134, at 30.  Relatedly, as the PSR reports, Leal participated in a "suboxone program from March 2016 until his arrest in June 2016 in an attempt to stop using heroin."  PSR ¶ 134, at 30.  According to the PSR, Leal "stated heroin was his drug of choice, but he never had a problem with heroin as he smoked it and did not use it intravenously. He denied using any other illegal substances."  PSR ¶ 134, at 30.  Nonetheless, the PSR reports that "[p]arole records reflected he tested positive for cocaine on May 20, 2016."  PSR ¶ 134, at 30. In addition,  the PSR notes:

> According to the forensic evaluation, the defendant was diagnosed with stimulant use disorder and it was recommend he receive substance abuse treatment and monitoring for possible substance abuse relapse with frequent yet irregular drug screening. He reported an extensive history of substance abuse since the age of 17. He indicated he began using cannabis and heroin on a regular basis until his arrest for the instant offense."

PSR ¶ 136, at 30.

Within the category of "Offender Characteristics," the PSR furthers indicates that Leal (i) "did not graduate high school," (ii) "was in special education classes since kindergarten"; "stopped attending high school to work"; "cannot read or write and has been receiving disability benefits

- 15 -

since 2007 due to his illiteracy."  PSR ¶ 137, at 30.  As to the latter, Leal reports that he "did not

know what his diagnosis was, but the social security office determined he cannot work."  PSR ¶

137, at 30.  As it relates to Leal's "Employment Record," the PSR reports that Leal is "currently

working at the Cibola County Correctional Center cutting hair . . . for $1 per day and works on a

daily basis."  PSR ¶ 138, at 31.  Relatedly, in assessing Leal's "Financial Condition: Ability to

Pay," the PSR contends that a "fine does not appear feasible," but Leal "does have earning potential

and community restitution could be imposed" by the Court, because (i) Leal "denied having any

assets or debts"; (ii) "earns $28 per month as a barber and spends the money on commissary"; and

(iii) "his credit report was unavailable as his information was identified as potentially fraudulent

or misused."  PSR ¶ 143, at 31-32.

The PSR then explains the Court's sentencing options.  See PSR ¶¶ 144-162, at 33-34.

Based on Leal's 21 U.S.C. § 846 and 21 U.S.C. § 841(b)(1)(A) violation in Case No. CR 16-3308,

the PSR explains that Leal's minimum term of imprisonment is 10 years, and the maximum

imprisonment term is life.  See PSR ¶ 144, at 32.  Relatedly, the PSR reports that, based on Leal's

21 U.S.C. § 846 and 21 U.S.C. § 841 (b)(1)(B) violation, the minimum imprisonment term is 5

years, and the maximum term is 40 years.  Accordingly, based upon a total offense level of 37 and

a criminal history category of VI, the PSR recommends a Guideline imprisonment range of 360

months to life.  See PSR ¶ 145, at 32.  Because there is no plea agreement in this case, the PSR

reports that a plea agreement will not impact the Guideline imprisonment range.  See PSR ¶ 146,

at 32.

The PSR then addresses Leal's "Supervised Release" terms, indicating that, under the

statutory provisions, in Case No. CR 16-3308, the Court must impose "a term of supervised release

of at least five years," PSR ¶ 147, at 32 (citing 21 U.S.C. § 841(b)(1)(A)), and in Case No. CR 16-

3069, the Court "must impose a term of supervised release of at least four years." PSR ¶ 147, at 32 (citing 21 U.S.C. § 841(b)(1)(B)). Relatedly, the PSR reports that in Case No. CR 16-3308, the Guidelines advise a five year-supervised release term, PSR ¶ 149, at 32 (citing U.S.S.G. § 5D1.2(c)), and in Case No. CR 16-3069, the Guidelines advise a 4-to-5 year supervised release term. The PSR then states that under 18 U.S.C. § 3624(E), the "[m]ultiple terms of supervised release shall run concurrently." PSR ¶ 148, at 32 (citing 18 U.S.C. § 3624(E)).

Next, in assessing the Court's options for "Probation," the PSR states that in both Case No. CR 16-3308 and Case No. CR 16-3069, under the statutory provisions, Leal "is ineligible for probation because [probation] is expressly precluded by statute." PSR ¶ 150, at 32 (citing 21 U.S.C. § 841 (b)(1)(A).; 21 U.S.C. § 841 (b)(1)(B)). Because probation is "expressly precluded by statute," Leal is also "ineligible for probation" in Case No. CR 16-3308 and CR 16-3069, under the Guidelines. PSR ¶ 152, at 32 (citing U.S.S.G. § 5B1.1(b)(2)).

The PSR then addresses the provisions for imposing supervision conditions, stating that "due to the nature and circumstances of the offense and the history and characteristics" of Lear, the Court may consider imposing supervision conditions as set forth in Attachment A. PSR ¶ 153, at 33 (citing 18 U.S.C. § § 3583(d)(1) and 3553(a)(1)).

Next, the PSR explains the maximum fines the Court can impose on Leal, indicating that for Case No, 1:16CR03308, the maximum fine is $10,000,000, and for Case No. 1:16CR03069, the maximum fine is $5,000,000. See PSR ¶ 154, at 33 (citing 21 U.S.C § § 841(b)(1)(A)_and (b)(1)(B)). Additionally, the PSR explains that a special assessment of $100 is mandatory for both Case No. 1:16CR03308 and Case No. 1:16CR03069. PSR ¶ 155, at 33 (citing 18 U.S.C § 3013). The PSR then discusses the Guideline Provisions, explaining that the fine range for Leal's offense is $40,000 to $10,000,000. See PSR ¶ 156, at 33. The PSR continues by noting the Court may

impose a fine up to the maximum authorized by statute if Leal is convicted under a statute authorizing: (i) "a maximum fine greater than $500,000," or (ii) "a fine for each day of violation." PSR ¶ 156, at 33 (citing USSG §§5E1.2(c)(3) and (c)(4)).  The PSR then states that the costs of prosecution, which may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs, shall be imposed on Leal as required by statute.  See PSR ¶ 157, at 33 (citing USSG §5E1.5).  The PSR explains, that in determining whether to "impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed."  PSR ¶ 157, at 33  (citing USSG § 5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6)). The PSR then provides the most recent monthly cost data from the Administrative Office of the United States Courts:

|  | Bureau of Prisons Facilities | Community Correction Centers | Supervision of Probation Officer |
|---|---|---|---|
| Daily | $103.00 | $95.00 | $12.00 |
| Monthly | $3,121.00 | $2,874.00 | $373.00 |
| Annually | $37,448.00 | $34,493.00 | $4,472.00 |

PSR ¶ 157, at 33.

Regarding restitution, the PSR states the restitution provision of 18 U.S.C. § 3663(a)(1)(A) apply in Leal's case and that there is no identifiable victim.  See PSR ¶ 158, at 33.  The PSR notes that community restitution may be ordered if: (i) Leal is convicted under 21 U.S.C. §§ 841, 848(a), 849, 856, 861, or 863, and (ii) the Court has considered the financial resources of Leal, the financial needs and earning ability of Leal and Leal's dependents, as well as any other factors the Court deems appropriate in determining whether to award community restitution.  See PSR ¶ 158, at 33 (citing 18 U.S.C. §§ 3663(c)(1) and 3663(a)(1)(B)(i)(II)).  The PSR then states that, because there is no identifiable victim and Leal was convicted of an offense involving 21 U.S.C §§ 841, 848(a),

849, 856, 861, or 863, the Court shall, taking into consideration the amount of public harm caused by the offense and other relevant factors, order community restitution not to exceed the fine imposed under U.S.S.G. § 5E1.2.  See PSR ¶ 159, at 34 (citing U.S.S.G. § 5E1.1(d)).  The PSR then notes that both cases involved a large quantity of methamphetamine, that Leal has a prior drug trafficking conviction, and that Leal has a history of abusing substances; thus, the PSR recommended the imposition of the following community restitution:

| Entity and Address | Amount |
| --- | --- |
| New   Mexico   Crime   Victim   Reparation Commission<br>Crime Victims Fraud<br>6200 Uptown Blvd. N.E. Suite 210<br>Albuquerque, New Mexico 87100<br>Re: Federal Community Restitution | $350 |
| Behavioral Health Services Division<br>New Mexico Human Services Department<br>P.O. Box 2348<br>Santa Fe, NM 87504<br>Re: Federal Community Restitution | $150 |
| Total | $500 |

PSR ¶ 160, at 34.

The PSR the addresses Leal's denial of federal benefits, indicating that, under statutory provision, at the discretion of the Court, Leal, having been convicted of a second drug distribution offense, shall be ineligible for any and all federal benefits for up to 10 years after such conviction. PSR ¶ 161, at 34 (citing 21 U.S.C. § 862(a)(1)(B)).  Equally, the PSR notes that the Court, "pursuant to 21 U.S.C. § 862, may deny eligibility for certain federal benefits of any individual convicted of distribution or possession of a controlled substance."  PSR ¶ 162, at 34 (citing U.S.S.G. § 5F1.6).  Next, the PSR notes that the probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range.  PSR ¶ 163, at 34.

The PSR then identified: (i) the nature and circumstances of the offense and history and characteristics of Leal, (ii) the seriousness of the offense/promotion of respect for the law/providing just punishment, and (iii) avoiding unwarranted sentencing disparities, as unique factors that relate to 18 U.S.C. 3553(a)(1)-(7) and may warrant a sentence outside of the advisory guideline system.  See PSR ¶ 164, at 35.

First, regarding the nature and circumstance of the offense and history and characteristics of Leal, the PSR states that both cases involve Leal conspiring to distribute 50 grams of methamphetamine while on parole.  See PSR ¶ 164, at 35.  Additionally, the PSR notes that Leal has a lengthy criminal history spanning the past 30 years, a history of violence, and has continued his criminal activity while in custody.  See PSR ¶ 164, at 35.  The PSR then notes that (i) Leal has suffered the loss of his parents and two siblings; (ii) Leal has two children; and (iii) Leal was in a long term relationship prior to being arrested.  See PSR ¶ 164, at 35.  Additionally, the PSR states that Leal was diagnosed with bipolar disorder, depression, and schizophrenia in 2008, and in 2017, a forensic evaluation diagnosed Leal with stimulant use disorder, malingering and antisocial personality disorder.  See PSR ¶ 164, at 35.  The PSR notes that Leal reports previously attending substance abuse counseling and that he was using heroin daily prior to his arrest for the instant offense.  See PSR ¶ 164, at 35.  The PSR then states that Leal has been receiving disability benefits since 2007 due to his illiteracy and that Leal reported his parents were also illiterate.  See PSR ¶ 164, at 35.

Next, regarding the seriousness of the offense/promotion of respect for the law/providing just punishment, the PSR notes that the offense here did not involve any acts of violence and that Leal's conviction involved him calling to set up a drug transaction while he was incarcerated to earn money.  See PSR ¶ 164, at 35.  Additionally, the PSR states the longest term of incarceration

Leal has served was 6.5 years.  See PSR ¶ 164, at 35.

Finally, regarding avoiding unwarranted sentencing disparities, the PSR reports that, as to Case No. CR 16-3069, co-Defendant B. Tapia was sentenced to 21 months of imprisonment and co-Defendant C. Tapia was sentenced to 18 months of imprisonment.  See PSR ¶ 164, at 35.  The PSR notes that Leal was involved in more drug transactions than the co-Defendants and Leal has a lengthy criminal history.  See PSR ¶ 164, at 35-36.  In addition, the PSR explains that Leal was found guilty at trial of Count 1 of the Indictment while the co-Defendants had plea agreements. See PSR ¶ 164, at 35-36.  As to Case No. CR 16-3308, the PSR states that Carmona was sentenced to 60 months of imprisonment and Arreola-Palma was sentenced to 48 months of imprisonment. See PSR ¶ 164, at 36.  The PSR notes that the co-Defendants had plea agreements while Leal was found guilty at trial of Count 1 of the Superseding Indictment.  See PSR ¶ 164, at 35.  Furthermore, the PSR states that Leal's lengthy criminal history impacted the guideline imprisonment range. See PSR ¶ 164, at 36.  The PSR concludes that, based on the listed factors, and in consideration of 18 U.S.C. §3553(a)(1)-(7), a downward variance outside the advisory guideline range may be warranted in this case.  See PSR ¶ 165, at 36.

### 4.    Leal's Sentencing Memorandum.

Leal filed a Sentencing Memorandum on February 4, 2020.  See Sentencing Memorandum at 1-7.  Leal requests that the Court vary substantially from the sentencing guidelines, which recommend a sentence of 360 months to life, because of Leal's diminished capacity.  Sentencing Memorandum at 2.  Leal explains that, following his conspiracy conviction in two separate trials, he "obtained a psychiatric review for purposes of sentencing, and that report is attached." Sentencing Memorandum at 2.  In the Sentencing Memorandum, Leal describes his personal history and argues that he is entitled to "a downward variance after consideration of factors described in title 18 U.S.C. sections 3553 (a)(1)-(7)."  Sentencing Memorandum at 2-4.

- 21 -

Leal states that he was born in Chicago, Illinois and that he

had a good childhood and he was close with both his parents.  His family was poor
but he was given his basic needs.  Leal had seven siblings growing up.  One of his
brothers and one of his sisters have passed away.  Leal lived in Chicago from birth
to 2007 when he moved to Albuquerque, New Medico, where he has lived since.

Sentencing Memorandum at 2.  Leal states that he attended high school until the twelfth grade, but

he stopped attending high school to work.  See Sentencing Memorandum at 3.  Leal states that was

placed in special education classes since kindergarten.  See Sentencing Memorandum at 3.  Leal

asserts that he cannot read or write, and has been receiving disability benefits since 2007 because

of his illiteracy.  See Sentencing Memorandum at 3.  Leal states that he was a self-employed barber

before he was arrested for the offenses for which the Court is sentencing him, where he earned

$1,100.00 per week.  See Sentencing Memorandum at 3.

Leal explains that he has struggled with mental health issues for a long time.  See

Sentencing Memorandum at 2-3.  Leal states that he has had auditory hallucinations since age

nineteen, and that he was hospitalized at age nineteen.  See Sentencing Memorandum at 2-3 (citing

Paret Report at 37-38, 42-50).  Leal asserts that he was diagnosed with bipolar disorder, depression,

and schizophrenia in 2008, and that he has been taking medications since his diagnosis.  See

Sentencing Memorandum at 2-3.  Leal notes that on May 17, 2016, New Mexico state probation

referred him for a biopsychological assessment and that he was diagnosed with "reaction to severe

stress."  Sentencing Memorandum at 3.

Next, Leal explains that he has had a history of substance abuse.  See Sentencing

Memorandum at 3.  Leal states that he first consumed alcohol at age nineteen or twenty-one, and

he alleges that the last time that he consumed alcohol was in 2010.  See Sentencing Memorandum

at 3.  Leal states that he first tried marijuana at age nineteen or twenty-one, and alleges that the last

time he used marijuana he was in his twenties.  See Sentencing Memorandum at 3.  Leal states

that he experimented with cocaine at about age twenty-nine.  See Sentencing Memorandum at 3.  Leal states that he first used heroin at age twenty-one, and that he used heroin on a daily basis until he was arrested for the federal offense that Court is sentencing him for.  See Sentencing Memorandum at 3.  Leal states that he participated in a "Suboxone program from March 2016 until his arrest in June 2016 in an attempt to stop using heroin.  He attended weekly individual and group substance abuse counseling at a program in downtown Albuquerque from March 2016 until he was arrested for the instant offense."  Sentencing Memorandum at 3.

Turning to the Sentencing Guidelines, Leal asserts that the Court must follow a three step-process: (i) the Court must properly determine the guideline range; (ii) the Court must determine whether to apply any of the guidelines' departure policy statements to adjust the guideline range; and (iii) the Court must consider all the factors in 18 U.S.C. § 3553(a) to determine whether a variance is warranted.  See Sentencing Memorandum at 3-4 (citing Gall v. United States, 552 U.S. 38 (2007); U.S.S.G. § 1B1.1(a)-(c)).  Leal argues that he "should receive a downward variance after consideration of factors described in title 18 U.S.C. sections 3553 (A)(1)-(7)."  Sentencing Memorandum at 4.  Leal contends that a downward variance would "allow him to quickly reach a point where he can get rehabilitated and engage in meaningful life activities."  Sentencing Memorandum at 5.  Leal argues that the conclusions in the Paret Report "illuminates very serious issues of diminished capacity, which were present at the time of commission of the instant offense."  Sentencing Memorandum at 5.  Leal states that the Paret Report diagnosed Leal with:

      (1)      Unspecified Schizophrenia Spectrum and Other Psychotic Disorder,

      (2)      Generalized Anxiety Disorder,

      (3)      Opioid Use Disorder, In Forced Remission[,]

      (4)      Cannabis Use Disorder, Severe, In Forced Remission,

      (5)      Posttraumatic Stress Disorder (PTSD),

      (6)      Borderline Intellectual Functioning, [and]

      (7)      Depressive Disorder Not-Otherwise-Specified.

Sentencing Memorandum at 5 (citing the Paret Report at 42-50).  Leal states the Paret Report

> indicant[s] "that the Defendant, Mr. Gaspar Leal did not have the cognitive abilities
> or emotional psychological stability to have formed Specific Intent to commit the
> crimes for which he was accused, primarily due to the fact that he likely was
> experiencing psychosis, substance-impaired decision making abilities and
> extremely limited cognition."  His psychosis "interferes with his ability to interpret
> the reality of circumstances surrounding specific-intent offenses" and paranoia and
> delusions "make it very difficult for him to interact and comprehend information
> appropriately, therefore meeting the legal term of not having had the necessary
> prerequisite abilities to form intent to further act or achieve a further consequence."

Sentencing Memorandum at 5-6 (quoting Paret Report at 37-38).  Leal argues that his "identified

mental health disorders, combined with the substance use, greatly reduced Mr. Leal's mental state

at the time of the offense and his diminished capacity during its commission is a factor which must

be taken into account in considering a variance."  Sentencing Memorandum at 6.  Leal maintains

that, based on the Paret Report's diagnosis and his "diminished capacity, a variance would be

reasonable and therefore authorized under Booker."  Sentencing Memorandum at 6 (citing United

States v. Booker, 543 U.S. 220 (2005)).

      **5.**      **The Forensic Neuropsychological Evaluation**

      Leal filed a Forensic Neuropsychological Evaluation along with his Sentencing

Memorandum on February 4, 2020.  See Paret Report at 1.  Dr. Alexander J. Paret identified the

following diagnostic impressions after examining Leal and reviewing his medical history: (i)

generalized anxiety disorder; (ii) opioid use disorder, severe, in forced remission; (iii) cannabis

use disorder, severe; (iv) schizophrenia; (v) Post-traumatic Stress Disorder ("PTSD"); (vi)

depressive disorder; and (vii) borderline intellectual functioning.  See Paret Report at 2.  In sum,

Dr. Paret concluded that Leal "began experiencing severe mental health symptoms during late

adolescence that coincided with his heavy polysubstance dependence and legal troubles." Paret Report at 42. As a result, Leal's "judgment is compromised by both situational and chronic factors. The most likely debilitating feature of Leal's current functioning is his unmanaged psychosis." Paret Report at 45. Dr. Paret recommends that Leal participate in cognitive behavioral therapy, visit a psychiatrist for medications, and engage in family therapy with his brother. See Paret Report at 49.

6. **The U.S. Sentencing Memorandum.**

The United States filed the U.S. Sentencing Memorandum on February 5, 2020. See U.S. Sentencing Memorandum at 1-8. The United States argues that Leal's crimes merit a sentence of 480 months of imprisonment. See U.S. Sentencing Memorandum at 5. The United States notes the "corrosive effect of the distribution and the consumption of controlled substances and their destructive impact on communities." U.S. Sentencing Memorandum at 5. The United States contends that Leal's "total offense level is appropriately driven by the quantity of controlled substances that he knowingly distributed and accurately portrays the severity of his offenses." U.S. Sentencing Memorandum at 5.

The United States emphasizes that Leal has committed himself to criminal activity, and has continuously violated both federal and state laws since Leal, now forty-nine years old, was seventeen years of age. See U.S. Sentencing Memorandum at 6. The United States contends that Leal's convictions are too numerous to detail meaningfully in the Sentencing Memorandum, but notes that Leal's convictions, offenses, and arrests "range from misdemeanor style DWI and driver's license offenses to the more serious variety of felony offenses such as theft, drug offenses, receiving or transferring a stolen vehicle, and aggravated battery upon a peace officer." U.S. Sentencing Memorandum at 6. The United States concludes that the case's facts and circumstances, combined with Leal's criminal history, do not support a sentence less than the

established Guideline range of imprisonment of 360 months to life, nor do they support a low-end Guideline sentence of 360 months.  See U.S. Sentencing Memorandum at 6.

Next, the United States notes that Leal has no respect for the law. See U.S. Sentencing Memorandum at 6.  The United States contends that, even when incarcerated, Leal made arrangements to distribute controlled substances on Albuquerque's streets. See U.S. Sentencing Memorandum at 6.  The United States emphasizes that Leal "has demonstrated through his unrepentant demeanor and criminal history spanning more than three decades that he simply does not value the respect and good faith of lawful society."  U.S. Sentencing Memorandum at 6.  The United States thus argues that imprisonment for 480 months would, as best as it could, effectively promote just punishment for Leal's offenses and adequate deterrence to Leal's criminal conduct in a context where no previous punishment in more than thirty years has managed to supply such deterrence.  See U.S. Sentencing Memorandum at 6.  Accordingly, the United States concludes that a sentence of 480 months of imprisonment "will promote respect for the law and attempt to provide just punishment for the offense," and that such a sentence is "necessary to protect the public from further crimes of the defendant."  U.S. Sentencing Memorandum at 7.

### 7.    The Addendum to the PSR.

The USPO filed the PSR Addendum on February 10, 2020.  See PSR Addendum at 1.  The USPO asserts that neither the United States nor Leal has filed any objections to the PSR.  See PSR Addendum at 1.  The PSR Addendum includes a statement of additional information:

> As to the mental and emotional health and substance abuse sections of the presentence report, the defendant, through defense counsel, provided a copy of the forensic neuropsychological evaluation completed by Alexander J. Paret, Ph.D., dated January 8, 2020, which is attached to the defendant's sentencing memorandum. According to the evaluation, the defendant was diagnosed with Generalized Anxiety Disorder; Opioid Use Disorder, Severe, In Forced Remission; Cannabis Use Disorder, Severe, In Full Remission; Unspecified Schizophrenia Spectrum and Other Psychotic Disorder; Posttraumatic Stress Disorder; Depressive Disorder Not-Otherwise-Specified; Rule-Out of Schizoaffective Disorder, and

> Borderline Intellectual Functioning. It was recommended he participate in Cognitive Behavioral Therapy (CBT), see a psychiatric and/or other medical professional for medications, participate in family therapy with his brother and the mother of his children, enroll in education classes, participate in an inpatient drug program, participate in prosocial activities or hobbies, join self help grounds and/or Narcotics Anonymous (NA) meetings, and upon release from inpatient treatment he should be released to his brother's residence with a strict schedule to include supervision.

PSR Addendum at 1 (citing Psych. Eval.).

**8.      The Sentencing Hearing.**

The Court held a Sentencing Hearing on May 27, 2020.  See Clerk's Minutes at 1.  First, the Court asked Leal whether he had read the PSR and the PSR Addendum.  See Transcript of Hearing at 3:8-10 (Court)(taken February 13, 2020)("Tr.").[3]  Leal explained to the Court that he does not know how to read and he did not entirely understand what was going on, although his lawyer had read the most "important" portions of the PSR and the PSR Addendum to him.  Tr. at 4:9-12 (Leal).  Leal also expressed confusion to the Court about his guilt for the two charges, given he felt he played a small role in the drug distribution conspiracy.  See Tr. at 5:1-7 (Bowles)

> Since I can't read, all I could do is remember, and the most I can remember, and It's just like confusing, I really . . . all I did was give a guy a number, and I even wrote a letter to you, where I explained it to one of the inmates and he helped me write a letter to you, and I don't know if you read that.

Tr. at 5:7-13 (Bowles).  The Court addressed Leal's alleged confusion by explaining to Leal that, because there is no plea agreement in the cases, there are certain things from both trials that he will get to appeal.  See Tr. at 6:19-25 (Court)("There are certain things that you're going to get to appeal because you had two trials.  So . . . what you're talking about, you're going to get to appeal and take it up to the Tenth Circuit, so that's a different issue.").  The Court then again

---

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

asked Leal if there was anything Leal wanted to clarify about the PSR and the PSR Addendum. See Tr. at 6:24-25 (Court).  At this time, Leal indicated that, although he still had substantive questions about his convictions, his counsel had explained to him all of the pertinent information within the sentencing memoranda, as well as Dr. Paret's psychological evaluation of Leal.  See Tr. at 8:1-10 (Leal).

The Court then proceeded to discuss the Guideline range.  See Tr. at 8:13-17 (Court). First, as the Court clarified, based on the PSR's calculations related to Leal's two convictions, Leal's "offense level is 37 and his criminal history category is VI," meaning that Leal's Guideline imprisonment range is "360 months to life."  Tr. at 8:13-16 (Court).  The Court then invited Leal to make comments on what would be an appropriate sentence for Leal.  See Tr. at 8:15-16 (Court).

Leal indicated that he had two primary points to make in support of his request for a substantial downward variance from the recommended Guideline sentence of 360 months imprisonment to life imprisonment.  See Tr. at 8:16-21 (Bowles).  First, Leal referenced Dr. Paret's diminished capacity findings during Leal's psychological evaluation and how such findings should justify a variance.  See Tr. at 8:22-25 (Bowles).  Specifically, as Leal explained, because Leal was convicted of conspiracy crimes that involved his telephone calls with a CI relating to the distribution of drugs, the CI "worked" Leal and took advantage of Leal's low intellectual functioning.  Tr. at 9:11 (Bowles).

> They came in, they brought a guy from Chicago. . . . And he's slick and he really . . . worked on Leal, talked about homies, talked about Chicago, talked about that's how they do it, that's how they set things up, but they got right to talk to Leal.  A guy who [has] border-line low intellectual functioning. . . . I think some of these scores Your Honor were like 65 and 70 IQ level.  There was really low functioning on some of the tests.  And his abilities to be swayed to be brought into the conspiracy.

Tr. at 9:11-22 (Bowles).  Leal admitted, nonetheless, that he has a criminal history, and while his role in both convictions was not necessarily "aberrant behavior," Tr. at 9:24 (Bowles), he still believes his diminished capacity played into how he and the CI set up the crime, Tr. at 10:1-4 (Bowles).  Moreover, Leal admitted, that, although he had drugs at his house, the CI and an ATF agent overpowered him when they came to his house and participated in the conspiracy with him. Tr. at 10:1-10 (Bowles).

> Now, he did participate in . . . . he did make the calls, but I think the Court should consider the diminished capacity intellectual findings with regard to how the facts come out in these cases.  I think that's where it plays in with the confidential informant.  He could have said no.  He didn't.  And I think some of it is when you read this -- he's functioning extremely low.

Tr. at 10:8-15 (Bowles).  In addition to his low intellectual functioning, Leal referenced Dr. Paret's findings regarding Leal's drug use -- in the form of Leal's opioid heroin use -- his trauma, and his significant anxiety and distress, all of which "combined to produce that diminished capacity," which, in turn, led the CI to take advantage of Leal.  Tr. at 10:18-19.  Moreover, Leal contended that the CI "was kind of perfectly placed to get him back engaged in necessary" criminal activities. Tr. at 10:19-21 (Bowles).

Leal then outlined his second point in support of his requested downward variance, which was that Leal's co-Defendants had received much lower sentences.  See Tr. at 11:1-4 (Bowles)("The highest sentence of the co-Defendants was I think 60 months.  There was also a 48-month, a 21-month, and an 18-month sentence.").  Accordingly, Leal requested that the Court make note of potential "unwarranted disparities in sentencing," despite Leal having a criminal history that puts him in a category VI, and despite Leal being a  career offender.  Tr. at 11:5-8 (Bowles).

> Now, I realize Leal has criminal history that puts him in a category VI and as a career offender -- and that has to be taken into account.  But when you look at

> the Government, who is asking for 4 years, and the Guidelines recommend 30 years
> to life -- for a man who is 49 years old.  And we're asking for a significant variance.
> In addition, I think the other sentences should be considered, including the top one
> of the guy who actually distributed, which was 60 months.

Tr. at 11:7-13 (Bowles).  Finally, Leal requested that the Court consider his history and what Leal

has experienced in his life, including the factors, the trauma, and the things he experienced in his

childhood, including his parents dying and his drug addiction problem: "And that's his problem .

. . is the substance use and he's got the mental health issues, . . . all the various mental health

treatment and medications, and psychiatric counselling. . . .  He's had PTSD findings.  And then

his drug use." Tr. at 12:1-6 (Bowles).  Based on Dr. Paret's findings related to Leal's health,

therefore, Leal argued that he does not think a forty-year sentence is appropriate, and in fact, he

contends that it is "wildly out of the scope of what I think the Guidelines would call for in this

situation."  Tr. at 12:10-12 (Bowles)  In sum, Leal requested that the Court vary downward

significantly in light of Dr. Paret's report and to avoid unwarranted sentencing disparities between

Leal's co-Defendants.  See Tr. at 12:15-17 (Bowles).  Leal concluded by stating that he takes full

responsibility for his crimes and is requesting help with his mental conditions  See Tr. at 12: 1-5

(Leal).

The Court then invited the United States to speak.  See Tr. at 13:6-8 (Court).  The United

States affirmed its central position that it is requesting a 480-month imprisonment sentence in this

case, because Leal "cannot present a compelling case for a downward variance from the

established Guidelines." Tr. at 13:19-21 (Hurtado).  The United States outlined several points it

wishes to address related to Leal's argument.  See Tr. at 14:4-7 (Hurtado).  First, according to the

United States, although Leal's co-Defendants received much lower sentences than what the United

States is recommending for Leal, there were, in the United States' view, "fundamental differences"

between the co-Defendants' statuses.  Tr. at 14:7-10 (Hurtado).  Namely, as the United States

continued, Leal "is the only one of the defendants who had two separate indictments . . . And, also he's the only one who chose to go to trial in this matter." Tr. at 14:11-15 (Hurtado). Moreover, as the United States further explained, Leal is the "only one who was classified as a career offender . . . . So he is in a much different situational position than the other co-defendants in this case. " Tr. at 14:16-23 (Hurtado).

Next, although the United States conceded that Dr. Paret's report indicates that Leal has experienced trauma and psychosis, the United States, nonetheless, urged the Court to recognize that "the overwhelming majority of people through the country who suffer through trauma or abuse do not go so far as to commit the extensive criminal record that is unique to this defendant." Tr. at 15:1-5 (Hurtado). The United States referenced the fact that, "for more than 30 years," Leal has engaged in the systematic and relentless pursuit of criminal activity, and to no avail." Tr. at 15:6-7 (Hurtado). As the United States continued,

> [t]he defendant continues to act, continues to commit crimes even when he's behind bars. The defendant is dangerous. One of the cases involved as the Court is aware the defendant placing phone calls from behind bars to the confidential informant in this case for the purpose of setting u drug deals.

Tr. 15:11-15 (Hurtado). Furthermore, while the United States recognized that Leal accepted full responsibility for his conduct," it noted that his "pleadings indicate otherwise," which was made clear by "the very first thing that he mentioned to the Court was that he was calling into question why the Government made certain charging decisions. He felt in essence what the Government walked away from was the impression that he felt it was unfair that the Government was prosecuting him for these particular crimes." Tr. 15:18-22 (Hurtado).

In addition, the United States emphasized that, with respect to the merits of his case, it was Leal "who initiated the contact with the confidential informant," and as the CI testified during both trials, "if Leal was not a worthy target of the investigation, the government would have dropped

the matter and completely walked away and Leal would not find himself standing before the Court." Tr. 16:11-16 (Hurtado).

Finally, the United States addressed Leal's drug addiction, which Dr. Paret's psychological evaluation discusses. See Tr. 16:16-20. Here, the United States emphasized again, that although it recognized Leal's drug addiction, Leal's drug addiction should not warrant a downward variance, given that "the overwhelming majority of people who now appeal before this Court, who are convicted of criminal offenses, also suffer from drug addiction." Tr. at 16:20-23 (Hurtado). Therefore, the United States argued that it "does not believe that the defendant's personal history and characteristics are anything that are unique to other defendants who appear before the Court," Tr. at 16:24-25 (Hurtado) and, the factors "do not justify a variance," Tr. at 17:1-3 (Hurtado).

The United States also argued that Leal,

> should not get a free pass because he has two convictions based on two separate superseding indictments and that is what compelled the United States to argue for a sentence of 480 months, which is above the low end of the applicable Guideline range. It is the position of the United States that Leal shouldn't get a free pass on one of the cases and just get the absolute low end of the Guideline range, which is 360 months. The defendant has an extensive criminal record. It is the position of the United States that he a danger to the community and a sentence of 480 months will protect the public from further crimes of Leal.

Tr. at 17:4-18 (Bowles).

Upon the completion of the United States' argument, the Court outlined Leal's sentence. See Tr. 18:8-21 (Court). In giving Leal's sentence, the Court first clarified that it adopted the PSR's factual findings as its own, because the parties made no objections to the PSR's factual findings. See Tr. at 18:11-14 (Court). The Court also indicated that it has considered the factors set forth in 18 U.S.C. § 2553(a)(1)-(7), and re-emphasized that Leal's offense level is 37, and his criminal history category is VI, with a recommended Guideline imprisonment range of 360-months to life. See Tr. at 18:11-14 (Court). The Court then proceeded to explain that it had "carefully

considered the Guidelines, but in arriving at is sentence, the Court has taken into account not only

the Guidelines bout other sentencing goals." Tr. at 19:5 (Court). Namely, the Court had

considered "the Guideline sentencing range established for the applicable category of offense

committed by the applicable category of defendant," and "identified a number of factors that put

downward pressure on the sentence here.". Tr. at 19:6-7 (Court). The Court then proceeded to

outline the 31 relevant factors "that put downward pressure on the sentence." Tr. 19:6-7 (Court)

> But just to review, the defendant's cases both involve the defendant conspiring to distribute more than 50 grams of methamphetamine, which as we know in this community, is a highly dangerous and addictive substance. He also committed the offenses while on parole. And, while pending federal charges, he continued his criminal activity and picked up a second federal case while in custody. The defendant has a lengthy criminal history. However, this is the first time the defendant will be sentenced federally. And the co-defendants for case number CR 16-3069, received a sentence of 18 months or 21 months imprisonment, while the co-defendants for case number CR 16-3308 received a sentence of 48 months or 60 months imprisonment. The offense didn't involve any acts of violence. The purity level of the methamphetamine and career offender enforcement significantly impacted the Guideline imprisonment range, and defendant has suffered the loss of his parents and two siblings. He has a history of drug abuse and mental health problems.

> Moreover, the defendant has been receiving disability benefits since 2007 because of his being illiterate. So I think that several factors in § 3553 put some downward pressure on this sentence. . . . In addition, think defendant's characteristics, the abuse, the trauma as I indicated -- I think I had read Dr. Paret's report earlier and looked and studied the drug addiction, and was struck by the problems he has. I. of course. am familiar with what has happened here with the confidential informant in this case, and I'm not sure I would word it necessarily as diminished capacity, because it is what it is, we're dealing with what Leal is. But I do think that this conspiracy, the bringing in the Chicago CI, and the language that I heard him use in the courtroom, appealed to Leal, and made him susceptible to the informant's request that he join in on the conspiracy.

> Looking at Dr. Paret's report, Leal does have some borderline functioning. He stays within the range. And then I compared that to the co-defendants with the top receiving 60 months. We're looking at a life of addiction of PTSD, and you know, you'd like to address these problems with drug counseling, more than with just incarceration, which is a little bit more of a blunt instrument. But, I did spend time with Dr. Paret's report. And so I think the sentence has to promote respect for the law, provide just punishment, and recognize that we can help Leal on supervised

release . . .  Lastly, Leal should not be penalized in any way  for going to trial.

Tr. at 19:10 (Court) - id. at 22:22. (Court).

Next, the Court stated that it had read the PSR twice and the psychological examination

report.  See Tr. at 23:8-10 (Court).  The Court stated that it paid close attention to Leal's intellectual

disability, the "psychosis he has had in his life," and that it is "encouraged that he's accepted

responsibility today."  Tr. at 23:12-12 (Court).  The Court stated that "there are some factors

however that continue to put upward pressure on" Leal's sentence.  Tr. at 23:14-16 (Court).  The

Court noted that Leal had joined the conspiracy; that his actions were not aberrant behavior; and

that Leal is career offender.  See Tr. 23:23-24:5 (Court).  The Court stated that

> some of [Leal's criminal activity] is extreme criminal behavior.  He's a danger to
> the public.  He committed these crimes.  He could have said no, but he didn't, and
> I'm sure drug use feeds [into] this.  But I don't have a ready answer to it today.  I
> have to protect the  public for whatever reason Leal is committing these crimes. [At
> one point, Leal had] only [been] out of prison three weeks [before he was] picked
> back up again [with the] federal charges here, so I have to recognize the seriousness
> of the offense, and again I have to have a sentence that promotes respect for the
> law, provides just  punishment and particularly I think in this case afford adequate
> deterrence both at a specific level, general level, and I've got to protect the public.
> I think that factor just really stands out when you go through this criminal history.
> I think avoiding unwarranted sentencing disparity among defendants with similar
> records who have been found guilty of similar conduct I think continues to put
> pressure on this, and again, what reasonableness means, I think when we're
> considering the guideline sentence, is it sufficient to represent these 3553(a) factors.

Tr. at 24:18-25:8 (Court).  The Court noted that Leal had continued to commit crimes even when

he was in custody, "[s]o he just doesn't seem to be quitting right at the moment, and there is nothing

to give me some encouragement that we'll turn the tide, and that you know he should be more in

supervised release than imprisonment."  Tr. at 25:16-20 (Court).  The Court stated that the upward

factors outweigh the downward factors, but that it did not think it should go higher up on the

Guideline's sentencing range, because there was not anything particularly aggravating about

Leal's conduct.  See Tr. at 26:2-17 (Court).

The Court stated that it had

concluded, after carefully considering the presentence reports and the arguments of counsel, that the punishment that's set forth in the guidelines is appropriate for these offenses. I've considered the kinds of sentence and range established by the guidelines, and the Court concludes that a range of 360 months is necessary, but also adequate to reflect the seriousness of the offenses, promote respect for the law, provide just punishment afford, adequate deterrence both at a specific and general level, protect the public. It's a guideline sentence so it avoids unwarranted sentencing disparities among defendants with similar records found guilty of similar conduct and . . . because the defendant will be placed on supervised release it effectively provides the defendant with some needed education and training and care to try to help him with some of the problems that have brought him to this point.

 In sum, I think the bottom of the Guideline range fully and effectively reflects each of the factors embodied in 18 U.S.C. § 3553(a). As I have indicated, I think the bottom of the guideline produces a reasonable sentence. And by that I mean one that is sufficient without being greater than is necessary to comply with the purposes of punishment set forth in the Sentencing Reform Act. . . .Next, the Court stated that Defendant Gaspar Leal is committed to the custody of the Bureau of Prisons for a term of 360 months. Said terms will run concurrently.

Tr. at 26:18-27:25 (Court). Next, "[t]he Court recommends that the Defendant participate in the

Bureau of Prisons 500 hour drug program." Tr. at 28:7-20 (Court). The Court stated that

the Defendant is placed on supervised release for a term of five years as to each count, said terms shall run concurrently. The defendant must comply with the mandatory and standard conditions of supervision and the following special conditions will also be imposed, I'm going to state seven of these [and] then I'll give the justification for all seven at that time.

 First you must participate in an outpatient substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program provider, location, modality, duration, intensity et cetera. You may be required to pay all or a portion of the cost of the program.

 Second you shall waive your right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor your progress. The probation officer may disclose the presentence report, any previous substance abuse evaluation and/or other pertinent treatment records to the treatment provider.

 Third, you must submit to substance abuse testing to determine if you have used a prohibited substance. Testing may include urine testing, the wearing of a

sweat patch, a remote alcohol testing system, and alcohol monitoring technology program, and/or any prohibited substance screening or testing. You must not attempt to obstruct or tamper with the testing method.  You may be required to pay all or a portion of the cost of the testing.

Fourth, you must submit to a search of your person plot property, vehicle, papers, computers as defined in 18 U.S.C. § 1030(e)(1), other electronic communication, or data storage devices, or media, or office under your control. The probation officer may conduct a search under this condition only when [reasonable] suspicion exists in a reasonable matter [and] reasonable nature for the purpose of detecting alcohol, drugs, firearms, illegal contraband.  You must inform any residents or occupants that the premises may be subject to a search.

Fifth, you must not use or possess alcohol.

Six, you must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive . . . substances, e.g. synthetic cannabinoids, synthetic cathinones that impair your physical or mental functioning whether or not intended for human consumption.

And then seven, you must not possess, sell, offer for sale, transport, cause to be transported, cause to affect interstate commerce, import or export any drug paraphernalia, as defined in  18 U.S.C. § 86(3)(d).

These  seven conditions are imposed, because both cases involved a large amount of methamphetamine. The Defendant admitted to using heroin on a daily basis before he was arrested on these federal offenses for which he's being sentenced today.  The Defendant also has a history of using marijuana and possessing  drug paraphernalia. These conditions will aid in his sobriety.

Next, you must participate in and successfully complete a community-based program which provides education and training in anger management.  This condition is imposed because the Defendant has a history of violence.

I'm [going to] state two [conditions related to the Defendant's] mental health issues [and] then I'll give the justification after I give [the] two conditions. First, you must participate in a mental  health treatment program and follow the rules and  regulations of that program.  The probation officer in consultation with the treatment provider will supervise your participation in the program. You may be required to pay all or a portion of the cost of the program. And second, you shall waive your right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor your progress.  The probation officer may disclose the presentence report any previous mental health evaluation and any other pertinent treatment records to the treatment provider. These two conditions are imposed because the Defendant has a history of mental health problems.

Next, you must not communicate or otherwise interact with co-defendants,

co-conspirators.  This condition is imposed in an attempt to prevent any further criminal activity.

Next, you must complete 50 hours of community service during your term of supervision.  The probation officer will supervise the participation in the program by approving the program,  agency, location, frequency of participation et cetera.  You must provide written verification of completed hours to the probation officer.  This condition is imposed as an alternative to a fine.  I'm not going to fine you.  So I want to explain that this is an alternative to a fine.  We'll talk about that in a moment.   And finally, you must reside in a residential reentry center for a term of six months.   You must follow the rules and regulations of the center and this condition is imposed to try [to help] the defendant with a stable living environment and to help him reintegrate back into society.   Probation has recommended community restitution but I think that's limited to situations in which the defendant has resources so the Court can impose a fine.  I'm not going to impose a fine here, not impose community restitution.   Based on the Defendant's lack of financial resources, the Court will not impose a fine.  The Court has carefully considered alternative sanctions such as community service  location monitoring or a halfway house in lieu of all or a portion of the fine and concludes the total  combined sanction without a fine or alternative [other than the halfway house] is sufficiently punitive. In accordance with U.S.S.G. § 5(E)(1)(2)(E), the Court has imposed as a special condition the defendant complete community service and reside at a residential reentry center and that is sufficiently punitive. The defendant shall pay a special assessment of $100 as to each count of conviction for a total of $200 which is due immediately.

. . .

It is ordered that the sentence is imposed as the Court has stated it.

Tr. at 26:18-33:23 (Court).  Next, the Court stated:

Leal, you can appeal your conviction if you believe that anything that occurred in the trial . . .was unlawful or involuntary, or if there is some other fundamental defect in the proceedings that was  not waived.  You also have a statutory right to  appeal your sentence under certain circumstances, particularly if you think the sentence is contrary to law. You have all the rights to appeal that the law gives you, because you went to trial twice, and you  therefore have the right to apply for leave to appeal  in forma pauperis and what that means is the Clerk of the Court will prepare and file a notice of appeal upon your request if you're unable to pay the cost of an appeal.  With very few exceptions, any notice of appeal must be filed within 14 days of the entry of judgment.  Leal, understanding that pursuant to 18 § 3742(a) within 14 days of the entry of judgment, you have the right to appeal the final sentence of this Court. You have the right to apply for leave to appeal in forma pauperis if you're unable to pay the cost of an appeal.

Leal, do you understand your rights to appeal in these two matters?

- 37 -

THE DEFENDANT: Not really.

THE COURT: Okay, but you understand you can appeal?

THE DEFENDANT: I don't understand. Like I heard about the appeal and stuff like that, just like going back to court.

THE COURT: It will be a different judge.

THE DEFENDANT: Okay.

THE COURT: You'll get to go to Denver, or your lawyers will go to Denver, and appeal up there, so you won't be coming to me to review my own work. You'll get to go to Denver and have them review everything that's taken place. Do you understand your rights to appeal?

THE DEFENDANT: Yeah, now.

Tr. at 33:24-35:11 (Court).

The Court then told Leal "good luck to you. You know, you're going to be in a lot of programs in the prison. Try to work hard on them." Tr. at 35:20-22 (Court). Leal responded, stating that he did accept "full responsibility I really do," and that he did not understand why the Court had stated that he had did not, and then concluded "Thank you, Your Honor. God bless." Tr. at 36:5-19 (Leal).

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory. 543 U.S. at 261. In excising the two §s, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "§ 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of § 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of

many others in the law enforcement community over a long period of time in an effort to fulfill

[its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing

the Guidelines as more than "just one factor among many").  They are significant, because "the

Guidelines are an expression of popular political will about sentencing that is entitled to due

consideration . . . ."   United States v. Cage, 451 F.3d at 593 (internal quotation marks

omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)).  A reasonable

sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States

v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within

the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d

1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349,

as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008).

This presumption, however, is an appellate presumption, and not one that the trial court can or

should apply.  See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States,

552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351.  Instead, the trial court must

undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[4]

---

[4]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more
appropriate to say that the resulting Guidelines ranges are advisory.  Gall v. United States, 552
U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now
advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir.
2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541
F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was
based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors,
and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines,
see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious
consideration to the extent of any departure from the Guidelines . . . ."), and must accurately

Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S.

_____

calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

> The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole.  The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).
>
> . . . .
>
> The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States, 552 U.S. 85 (2007), that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. at 101 (alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."  Irizarry v. United States, 553 U.S. 708, 710-16 (2008).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.  See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States   v.   Nolf,   30   F. Supp. 3d   1200,   1222-24,   (D.N.M.   June   20, 2014)(Browning, J.)(emphasis in original).

at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has concluded that the case of an illegal immigrant who re-entered the United States to provide for his two children and two siblings was not materially different from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. See United States v. Almendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).

## LAW REGARDING CAREER OFFENDERS

The Sentencing Guidelines authorize an increase in the criminal history category if the defendant is identified as a "career offender." United States v. Thyberg, No. 10-196 JAP, 2016 WL 8914537, at *2 (D.N.M. Oct. 6, 2016)(Parker, J.), report and recommendation adopted, No. 10-196 JAP, 2016 WL 8919405 (D.N.M. Dec. 5, 2016). The Sentencing Guidelines provide:

> A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1. The Sentencing Guidelines define "two prior felony convictions" as

> (c) The term "two prior felony convictions" means (1) the defendant committed the instant offense of conviction subsequent to sustaining at least two

- 42 -

felony convictions of either a crime of violence or a controlled substance offense (i.e., two felony convictions of a crime of violence, two felony convictions of a controlled substance offense, or one felony conviction of a crime of violence and one felony conviction of a controlled substance offense), and (2) the sentences for at least two of the aforementioned felony convictions are counted separately under the provisions of § 4A1.1(a), (b), or (c). The date that a defendant sustained a conviction shall be the date that the guilt of the defendant has been established, whether by guilty plea, trial, or plea of nolo contendere.

U.S.S.G. § 4B1.2 (bold in original). The Sentencing Guidelines further state that "a diversionary disposition is counted only where there is a finding or admission of guilt in a judicial proceeding." Application Note 3 to U.S.S.G. § 4A1.1.

## **LAW REGARDING RELEVANT CONDUCT FOR SENTENCING**

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, n.1(H). In United States v. Booker, the Supreme Court notes:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction. That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)). The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the Guidelines.

§ 1B1.3(a) provides that the base offense level under the Guidelines "shall be determined" based on the following:

(1)

(A)     all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the

defendant; and

> (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)    solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)     any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not resulted in a conviction.  Pursuant to § 6A1.3's commentary, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning, J.), aff'd, 523 F.3d 1258 (10th Cir. 2008).  Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").  The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct consists primarily of two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  See 515 U.S. at 404-06.  The defendant in Witte v. United States had been involved in an unsuccessful attempt to import marijuana and cocaine into the United States in 1990, and in an attempt to import marijuana in 1991.  See 515 U.S. at 392-93.  In March, 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and thus calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with his activities in 1990.  See 515 U.S. at 392-93. The defendant moved to dismiss the indictment, contending that he had already been punished for the cocaine offenses, because the court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was

contrary to other United States Courts of Appeals opinions, including a Tenth Circuit opinion, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the Courts of Appeals and affirmed the Fifth Circuit decision.  See Witte v. United States, 515 U.S. at 395.  In holding that a district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  See United States v. Watts, 519 U.S. at 149. The Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149

(citing United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  United States v. Watts, 519 U.S. at 151 (quoting 18 U.S.C. § 3661).  According to the Supreme Court, 18 U.S.C. § 3661 codifies "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit caselaw now adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause).  In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290. The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In  United States v. Coleman, the defendant appealed the district court's sentence enhancement for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth

Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal on firearms charges.  See 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(Green, J.)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing the defendant's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing relevant federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at 1429.

Relatedly, in United States v. Washington, the defendant argued that the United States needed to prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court

considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life in prison.  See 11 F.3d at 1515.  The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard."  11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).  See United States v. Sangiovanni, 2014 WL 4347131, at *22-26 (concluding that a sentencing court can cross reference from the Guidelines that correspond to the defendant's crime of conviction to the Guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1314-15 (D.N.M. 2014)(Browning, J.)(cross-referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

       The Court previously has held that it may consider a defendant's refusal to answer questions for the PSR, while not drawing an adverse inference from the refusal.  See United States v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. 2012)(Browning, J.).  The Court also has held that, although it can consider a defendant's silence about information regarding herself or others engaging in criminal conduct, it will not rely on that silence to increase the defendant's sentence.  See United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814, at *13 n.5 (D.N.M. 2012)(Browning, J.).  Finally, the Court has held that a defendant's "aggression

towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence. United States v. Romero, No. CR 09-1253 JB 2012 WL 6632493, at *23 (D.N.M. Dec. 6, 2012)(Browning, J.).  See United States v. Tapia, No. CR 12-3012 JB, 2017 WL 6417610, at *10-15 (D.N.M. Dec. 14, 2017)(Browning, J.).

## LAW REGARDING CALCULATING CRIMINAL HISTORY

Section 4A1.1 of the U.S.S.G states, in relevant part: "The total points from items (a) through (f) determine the criminal history category in the Sentencing Table in Chapter Five, Part A."  U.S.S.G. § 4A1.1.   Subsection (a) states: "Add **3** points for each prior sentence of imprisonment exceeding one year and one month."   U.S.S.G. § 4A1.1(a) (bold in original). Application Note 1 to U.S.S.G. § 4A1.1 states:

> Certain prior sentences are not counted or are counted only under certain conditions:
>
> > A sentence imposed more than fifteen years prior to the defendant's commencement of the instant offense is not counted unless the defendant's incarceration extended into this fifteen-year period.  *See* § 4A1.2(e).
> >
> > A sentence imposed for an offense committed prior to the defendant's eighteenth birthday is counted under this sub§ only if it resulted from an adult conviction.  *See* § 4A1.2(d).
> >
> > A sentence for a foreign conviction, a conviction that has been expunged, or an invalid conviction is not counted.  *See* § 4A1.2(h) and (j) and the Commentary to § 4A1.2.

U.S.S.G. § 4A1.1 Application Note 1.  Subsection (b) to U.S.S.G. § 4A1.1 states: "Add **2** points for each prior sentence of imprisonment of at least sixty days not counted in (a)."  (bold in original). There is no limit to the number of points that may be added under either sub§ (a) or sub§ (b).  See U.S.S.G. § 4A1.1 Application Notes 1, 2.

Section 4A1.2(d) handles "offenses committed prior to age eighteen."  U.S.S.G. § 4A1.2(d)

(title case omitted).  It provides that, "[i]f the defendant was convicted as an adult and received a

sentence of imprisonment exceeding one year and one month, add **3** points under § 4A1.1(a) for

each such sentence."  U.S.S.G. § 4A1.2(d) (bold in original).  Application Note 7 to U.S.S.G.

§ 4A1.2 provides that,

> for offenses committed prior to age eighteen, only those that resulted in adult
> sentences of imprisonment exceeding one year and one month, or resulted in
> imposition of an adult or juvenile sentence or release from confinement on that
> sentence within five years of the defendant's commencement of the instant offense
> are counted.

U.S.S.G. § 4A1.2 Application Note 7.

Section 4A1.2(a)(2), which announces definitions and instructions for computing criminal

history, provides:

> If the defendant has multiple prior sentences, determine whether those
> sentences are counted separately or as a single sentence.  Prior sentences always
> are counted separately if the sentences were imposed for offenses that were
> separated by an intervening arrest (*i.e.*, the defendant is arrested for the first offense
> prior to committing the second offense).  If there is no intervening arrest, prior
> sentences are counted separately unless (A) the sentences resulted from offenses
> contained in the same charging instrument; or (B) the sentences were imposed on
> the same day.  Count any prior sentence covered by (A) or (B) as a single sentence.

U.S.S.G. § 4A1.2(a)(2).  According to § 4A1.2(a)(2)'s plain language, if an intervening arrest

separates two sentences, the two sentences are considered separate for the purposes of criminal

history calculation, even if the sentences were imposed at the same hearing.  See, e.g., United

States v. Chavez, No. CR 18-0836 JB, 2018 WL 6621283, at *11 (D.N.M. Dec. 18,

2018)(Browning, J.).  For the two prior sentences to be considered a single sentence when no

intervening arrest separates the two sentences, one of § 4A1.2(a)(2)'s preconditions must apply,

and the sentences must have either emanated from the same charging instrument or been imposed

on the same day.  See U.S.S.G. § 4A1.2(a)(2).  "That observation is, accordingly, the end of the

debate for purposes of applying § 4A1.2(a)(2)."  United States v. Bhakta, No. CR 16-1090 JB,

2017 WL 4785953, at *9 (D.N.M. Oct. 21, 2017)(Browning, J.).

Section 4A1.1(e) provides: "Add **1** point for each prior sentence resulting from a conviction of a crime of violence that did not receive any points under (a), (b), or (c) above because the sentence was treated as a single sentence, up to a total of **3** points for this sub§." U.S.S.G. § 4A1.1(e) (bold in original). Application Note 5 to U.S.S.G. § 4A1.1 provides, in relevant part:

> In a case in which the defendant received two or more prior sentences as a result of convictions for crimes of violence that are treated as a single sentence (*see* § 4A.1.2(a)(2)), one point is added under § 4A1.1(e) for each such sentence that did not result in any additional points under § 4A1.1(a), (b), or (c). A total of up to 3 points may be added under § 4A1.1(e).

U.S.S.G. § 4A1.1 Application Note 5 (italics in original).

## LAW REGARDING DOWNWARD DEPARTURES

"[T]he Guidelines place essentially no limit on the number of potential factors that may warrant a departure." Burns v. United States, 501 U.S. 129, 136 (1991), abrogated on other grounds by United States v. Booker, 543 U.S. 220. See United States v. Coleman, 188 F.3d 354, 358 (6th Cir. 1999)(en banc)(stating that "[t]here are a potentially infinite number of factors which may warrant a departure"); 18 U.S.C. § 3661 (stating that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline." Koon v. United States, 518 U.S. 81, 98 (1996). Accord United States v. Lewellen, No. CR 11-1524 JB, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the

congressional purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

For example, in United States v. Jim, 877 F. Supp. 2d 1018 (D.N.M. 2012)(Browning, J.), the Court did not grant a defendant's request for a downward departure under U.S.S.G. § 4A1.3(b), where the defendant argued that his criminal history category overrepresented the seriousness of his criminal history and the likelihood that he would commit other crimes. See United States v. Jim, 877 F. Supp. 2d at 1044-45. The Court noted that Jim's criminal history included: "(i) two DWI convictions; (ii) a conviction for Roadway Laned for Traffic; and (iii) Abandonment or Abuse of a Child." United States v. Jim, 877 F. Supp. 2d at 1045. The Court concluded that a criminal history category of II did not over-represent Jim's criminal history, explaining that Jim's previous convictions involved alcohol and driving, demonstrating a pattern of aberrant use of alcohol also seen in the offense for which he was sentenced -- sexual assault -- as Jim asserted that both he and the victim were intoxicated at the time he assaulted the victim. See United States v. Jim, 877 F. Supp. 2d at 1022-23, 1044-45. The Court noted that "[i]t does not take much for a defendant to qualify for a criminal history category of II" and that the Court could not distinguish Jim's criminal history from that of other defendants that the Court regularly sees who also have a criminal history category of II, and thus denied Jim's request for a downward departure under U.S.S.G. § 4A1.3. United States v. Jim, 877 F. Supp. 2d at 1045.

In United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), the Court denied a defendant's request for a downward departure, under U.S.S.G. § 5H1.11, based upon the defendant's eleven years of military service. See United States v. Jager, 2011 WL 831279, at *10-11. Even though Jager had received exemplary reviews in his military performance reports, earning either the highest or second highest ratings possible, the

Court concluded that his service was not present in an unusual degree or distinguishable from other cases which the Guidelines cover. See United States v. Jager, 2011 WL 831279, at *10-11. The Court noted that in many child pornography cases, such as Jager's case, the defendant leads an exemplary life publicly, while engaging in a sordid secret life privately. See United States v. Jager, 2011 WL 831279, at *11. Additionally, Jager was not in intense combat during his military career; most of his time was spent in the support role of a mechanic. See United States v. Jager, 2011 WL 831279, at *11. The Court concluded, thus, that Jager's military service did not distinguish his case from those of many other defendants who commit child pornography, and the Court denied Jager's request for a downward departure. See United States v. Jager, 2011 WL 831279, at *11.

### LAW REGARDING MINOR ROLE ADJUSTMENT

§ 3B1.2 provides for a 2- to 4-level downward adjustment of a criminal defendant's offense level if the criminal was a "minor" or "minimal" participant in the crime for which he or she is being sentenced. U.S.S.G. § 3B1.2. The Tenth Circuit has determined that the district court has discretion over this downward adjustment and that the court only should grant it if the court finds that the defendant is less culpable than the other participants in the particular offense. See United States v. Santistevan, 39 F.3d 250, 254 (10th Cir. 1994). It is the defendant's burden to prove, by a preponderance of the evidence, that he or she was a minor participant. See United States v. Mendez, 272 F. App'x 703, 705 (10th Cir. 2008)(unpublished)(citing United States v. Santistevan, 39 F.3d at 254).

The commentary to the Guidelines, which is authoritative unless it conflicts with federal law, states that the 4-level decrease for "minimal" participation will be used infrequently and should be reserved for "defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 Application Note 4. The 2-level decrease for "minor" participation applies to individuals who are "less culpable than most other participants in the

criminal activity, but whose role could not be described as minimal."  U.S.S.G. § 3B1.2 Application Note 5.  "Finally, the Guidelines permit a three-level decrease for an individual whose culpability is somewhere between that of either a minimal or a minor participant."  United States v. Santistevan, 39 F.3d at 254.  See U.S.S.G. § 3B1.2.

The Tenth Circuit has repeatedly addressed the situation in which a drug courier requests a downward adjustment of offense level based on U.S.S.G. § 3B1.2.  See, e.g., United States v. Martinez, 512 F.3d 1268, 1276 (10th Cir. 2008)(Tymkovich, J.); United States v. Rangel-Arreola, 991 F.2d 1519, 1524 (10th Cir. 1993); United States v. Arredondo-Santos, 911 F.2d 424, 426 (10th Cir. 1990); United States v. Calderon-Porras, 911 F.2d 421, 423 (10th Cir. 1990). The Tenth Circuit has consistently held that a defendant being a courier does not, ipso facto, render him or her a minor participant:

> [W]e have consistently "refused to adopt a per se rule allowing a downward adjustment based solely on a defendant's status as a drug courier." *United States v. Rangel-Arreola*, 991 F.2d [at] 1524 . . . . We explained, "[d]rug couriers are an indispensable component of drug dealing networks."  *Id.*  To debate whether couriers as a group are less culpable would not be productive, "akin to the old argument over which leg of a three-legged stool is the most important leg." *United States v. Carter*, 971 F.2d 597, 600 (10th Cir. 1992).

United States v. Martinez, 512 F.3d at 1276. Courts must therefore make a fact-intensive inquiry whether the courier was, for reasons other than his or her mere status as a courier, a minor or minimal participant in the relevant crimes.

## ANALYSIS

In 18 U.S.C. § 3553(a), Congress instructs courts to consider a number of factors when imposing a sentence.  Leal asks the Court to impose a sentence "outside of and below that suggested by the advisory Sentencing Guidelines after finding that a variance is justified . . . ." Sentencing Memo at 6.  The Court declines to vary downward because, in Leal's case, these factors indicate that the Court should impose a sentence within the Guidelines range.  See Tr. at 25:24-

26:1 (Court).  The Court must impose a sentence that is "sufficient but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553(a)(2).  18 U.S.C. § 3553(a).  Here, "the bottom of the Guideline range fully and effectively reflects each one of the factors embodied in 18 U.S.C. § 3553(a)."  Tr. at 26:13-15 (Court).  Accordingly, the Court sentences Leal to 360 months imprisonment and five years of supervised release.  See Tr. at 25:24-26:1 (Court).

The Court has considered the Guidelines and, in arriving at its sentence, has taken account of the Guidelines with other sentencing goals.  Specifically, the Court has considered the Guidelines' sentencing range established for the applicable category of offense that the applicable category of defendant commits.  The Court concludes that the punishment set forth in the Guidelines is appropriate for these offenses.  It has considered the kinds of sentence and remedies that the Guidelines establish.  The Court concludes that a sentence of 360 months, along with five years of supervised release, reflects the offenses' seriousness, promotes respect for the law, provides just punishment, affords adequate deterrence both at a specific and general level, protects the public, avoids unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and effectively provides the defendant with needed education, training and care, and fully reflects each of the factors that 18 U.S.C. § 3553(a) embodies.  The Court concludes that the sentence is sufficient, but not greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act.

At the sentencing hearing, the Court noted that it had identified thirty-one factors which place downward pressure on Leal's sentence.  See Tr. at 19:7-8 (Court).  "Some of these overlap, as often happens when we're considering these 3553 factors."  Tr. at 19:8-10 (Court).  First, this case is the first time Leal has been sentenced federally.  See Tr. at 19:19-20 (Court).  Second, his Co-defendants in the first case, No. CR 16-3069, received a sentence between 18 and 21 months.

See Tr. at 19:21-24 (Court).  Third, his Co-defendants in the second case, No. CR 16-3308, received a sentence between 48 and 60 months.  Tr. at 19:20-25 (Court).  The Court also considers the circumstances of Leal's crime.  Fourth, Leal referred the undercover agent to a person from whom he could purchase methamphetamine, and was "more of a middle man" in the offenses. PSR ¶ 35, at 10.  See id. ¶ 12, at 6.  Fifth, the undercover agent initiated contact with Leal.  See, e.g., PSR ¶¶ 14-16, at 6.; Tr. at 21:2-6 (Court)(noting that Leal was "susceptible to the informant's request that he join in on the conspiracy").  Sixth, Leal's offenses are non-violent.  See Tr. at 19:25-20:1 (Court).  Seventh, the purity of the methamphetamine involved in Leal's offense, and, eighth, his career offender status "significantly impacted his Guideline imprisonment range."  Tr. at 20:1:1-5 (Court).  See PSR ¶ 164, at 35.

Next, the Court considers the many difficult experiences that Leal has undergone in his life.  Notably, Leal's parents, with whom he had a close relationship, both passed away.  See PSR ¶ 122, at 27.   Ninth, his mother passed away as a result of liver problems in 1992.  See PSR ¶ 122, at 27.  Tenth, his father passed away after a heart attack in 1997.  See PSR ¶ 122, at 27.  Eleventh, Leal's brother passed away from a heart attack approximately twenty-six years ago.  See PSR ¶ 122, at 27.  Twelfth, Leal's sister passed in December, 2017 from colon cancer.  See PSR ¶ 124, at 27.  Thirteenth, Leal, his parents, and two of his siblings are all illiterate, and Leal's "father discouraged them from going to school."  PSR ¶ 124, at 27.  Fourteenth, Leal has received disability benefits since 2007 because of his illiteracy.  See PSR ¶ 137, at 31.  Fifteenth, Leal's childhood "was characterized by suffering physical and sexual abuse, and witnessing trauma being inflicted onto loved ones."  Paret Report at 2.

Subsequently, the Court considers Leal's mental health problems as putting downward pressure on the sentence.  Sixteenth, Leal suffers from schizophrenia.  See PSR ¶ 129, at 29; Paret

Report at 11.   Seventeenth, as a result, Leal has visual and audio hallucinations, including "hear[ing] voices two to three times a day."  PSR ¶ 129, at 29.  See Paret Report at 11 (stating that Leal "believes others were out to get him, others could read his mind, and receiving special messages from the television and/or radio").   Eighteenth, Leal has been diagnosed with bipolar disorder.   See PSR ¶ 129, at 29.   Nineteenth, Leal has clinical depression.   PSR ¶ 129, at 29.  Twentieth, Leal demonstrates symptoms of Post-traumatic Stress Disorder ("PTSD").   See Paret Report at 11; id. at 25 (listing traumatic events which caused the PTSD "including a motor vehicle accident at the age of 15, being bullied and sexually abused at the age of 8, being robbed at knife-point at the age of 21, family members passing between 1992 and 2017, and a prison riot at the age of 47").   Twenty-first, Leal suffers from generalized anxiety disorder.   See Paret Report at 11.  Twenty-second, Leal has an intellectual disability; he "demonstrated significant cognitive deficits and performed in the lower extreme range on all intellectual testing."  Paret Report at 5.  See id. at 7 (stating that Leal was in "special education programming" as a child).   Twenty-third, Leal has "low average to profound abilities to commit information memory well enough for retrieval."  Paret Report at 11.  Twenty-fourth, Leal's "Judgment/Insight" is categorized at "poor/poor."  Paret Report at 11.   Twenty-fifth, Leal  experiences seizures, which have caused him to fall and hit his head.   See Paret Report at 8.

The Court also takes Leal's drug and alcohol problems into account as placing downward pressure on Leal's sentence.  Twenty-sixth, Leal has had significant drug addiction problems since age seventeen.   See PSR ¶ 136, at 30.  Twenty-seventh, at age seventeen, he "began a problematic relationship with marijuana."  Paret Report at 2.  Twenty-eighth, most notably, Leal has struggled with heroin addiction since age nineteen.   See PSR ¶ 134, at 30; Paret Report at 9 (stating that Leal "clarified that heroin was the most problematic"); id. at 18 (categorizing Leal's opioid use disorder

as "severe"). Twenty-ninth, Leal has also abused alcohol, resulting in at least five alcohol related criminal charges. See Paret Report at 9. Thirtieth, in general, Leal's substance abuse and mental health problems "call his judgment into question as well as . . . his overall decision-making abilities." Paret Report at 2. These put downward pressure on the sentence to take it below the Guideline range, because the Court could substitute supervised release for incarceration to deal with the mental health and substance abuse issues.

Last, the Court considers that, at the sentencing hearing, Leal accepted responsibility for his actions. See Tr. at 13:1-3 (Leal)(stating that "I take full responsibility for the things, how things went. And I need help."); Tr. at 22:12-13 (Court)(stating that the Court is "encouraged that he's accepted responsibility today"). With supervised release, Leal may be ready to move to more constructive participation in society. His attitude and specific problems put pressure to decrease incarceration and move more quickly to supervised release.

The Court also considered thirteen factors that place upward pressure on Leal's sentence. First, Leal's criminal history category of VI is "justified. He's a career offender . . . . Some of this is extreme criminal behavior." Tr. at 23:7-9 (Court). Second, specifically, Leal has twenty-five prior adult criminal convictions. See PSR ¶¶ 61-86, at 12-21. Third, the Court also considers that Leal "is a danger to the public. He could have said no, but he didn't." Tr. at 23:10-12 (Court). Fourth, Leal's drug use makes him more dangerous to the public as it spurs his willingness to commit crimes. See Paret Report at 21 (explaining that Leal "spends a great deal of time in activities and criminal behaviors to obtain heroin and/or recover from its effects"); Tr. at 23:10-12 (Court). Fifth, the Court also evaluates the offense's seriousness, and, sixth, the need to promote respect for the law. See Tr. at 23:19-23 (Court). Seventh, the Court is dismayed that Leal's federal offenses took place when he had been released from prison only three weeks before. See Tr. at

23:18-20 (Court).  Eighth, a Guidelines sentence is necessary to afford adequate deterrence, both at a specific and general level.  See Tr. at 23:23-25 (Court).  Ninth, a Guidelines sentence also is necessary to avoid sentencing disparity among defendants with similar records who have been found guilty of similar crimes.  See Tr. at 24:3-9 (Court).  Tenth, moreover, other individuals "who have gone through abuse and trauma don't commit these crimes."  Tr. at 24:9-15.  Eleventh, Leal also committed some of the offenses in this case while in prison.  See Tr. at 24:14-19 (Court). Twelfth, further, Leal has repeatedly committed new offenses while on probation.  See, e.g., PSR ¶¶ 71-72, at 14-15.  These facts indicate to the Court that Leal will not "turn the tide, that . . . he should [not] be more in supervised release than imprisonment."  Tr. at 24:19-20 (Court).  Last, although Leal has begun to accept some responsibility for his actions, he is still "fighting a lot of things."  Tr. at 24:21-24 (Court).  Consequently, the Court has considered these factors and concludes that a 360-month sentence, at the low end of the Guideline range, is sufficient, but not greater than necessary, to comply with the four purposes that 18 U.S.C. § 3553(a)(2) enumerates.

    **IT IS ORDERED** that the Defendant Gaspar Leal is sentenced to 360 months of imprisonment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

John Anderson
   United States Attorney
Samuel A. Hurtado
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Jason Bowles

Bowles Law Firm
Albuquerque, New Mexico

*Attorney for the Defendant*